486 So.2d 855 (1986)
STATE of Louisiana
v.
Michael BURGE.
No. 85 KA 0899.
Court of Appeal of Louisiana, First Circuit.
March 25, 1986.
Rehearing Denied April 29, 1986.
*857 Stephen L. Laiche and William B. Faust, III, Asst. Attys. Gen., New Orleans, for the State.
J. Michael McDonald and David E. Stanley, Baton Rouge, for defendant.
Before GROVER L. COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
WATKINS, Judge.
Michael Burge was originally charged by a single grand jury indictment with three counts of first degree murder. Prior to trial on the merits, the indictment was amended to reduce each charge to second degree murder in violation of LSA-R.S. 14:30.1. Thereafter, defendant withdrew his former plea of not guilty and not guilty by reason of insanity and entered a plea of not guilty. Following trial by jury, defendnat was convicted on each count as charged by the amended indictment. The trial court sentenced defendant to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence, on each count. The sentences for counts one and two are to be served consecutively to each other and to any other sentence defendant *858 is now serving. The sentence for count three is to be served concurrently.
Defendant brings this appeal urging ten assignments of error:
1. The trial court erred in failing to suppress the confession of the defendant.
2. The trial court erred in failing to suppress inflammatory, prejudicial photographs.
3. The trial court erred in not granting a mistrial after two violations of its order of sequestration of witnesses.
4. The trial court erred in failing to grant a mistrial after the misconduct and harassment of defense witnesses by the state.
5. The trial court erred in failing to grant a mistrial after harassment by the state of the defendant.
6. The trial court erred in failing to grant a mistrial after improper conduct of the prosecution by referring to a nickname of the defendant in violation of court order.
7. The trial court erred in failing to grant a judgment of acquittal.
8. The trial court erred in failing to grant a mistrial or a new trial because of the cumulative prejudicial effect of the acts of the state and prosecution.
9. The trial court erred in failing to grant a mistrial or seat an alternate juror when a juror viewed the defendant shackled.
10. The trial court erred in admitting into evidence the autopsy report of Dr. Cavalier.
It is conceded by defendant that, shortly after midnight on a Sunday night, he fatally stabbed Ricky Gray, Mark Vincent and Lester Allen with a knife fashioned from a sharpened file. A fourth individual, Darryl Washington, was also stabbed by defendant, but he survived.[1] At the time of the instant offenses, defendant and the victims were all inmates of Louisiana State Penitentiary at Angola, housed in Magnolia 3 dormitory.
Magnolia 3 dormitory is a prison structure capable of housing sixty inmates, who sleep in one large room with their individual beds arranged side by side in several long rows. Prison personnel characterize the facility as an appropriate placement for an inmate who is not easily integrated into the general prison population.
After making a formal request for protection because of difficulties encountered in another placement at Angola, defendant was moved to Magnolia 3 dormitory some six weeks before the stabbing incident occurred. Robert Shriver was already housed in that facility. Shriver and defendant, both white inmates, subsequently developed a homosexual relationship. Antagonism developed between defendant and Shriver and a group of several black inmates, which included the instant victims. One of those inmates, Larry Thomas, testified that he and Lester Allen broke the lock on Shriver's locker box during the Friday preceding the stabbing incident and stole several items. Larry Thomas admitted that defendant asked to have half of his and Shriver's things returned; however, Thomas was unwilling or unable to comply. Thomas maintains that defendant threatened to recover his property "one way or another." Warren Cain, an inmate who testified for the state, claims to have overheard a conversation among defendant, Shriver, Lester Allen and Mark Vincent during the afternoon immediately preceding the stabbing incident. Cain characterized Allen's and Vincent's response to defendant's request to have his property returned as one of indifference. Defendant was advised to seek return of his property whatever way he wanted.
Defendant and defense witnesses, Al Bates and Aubrey Thompson, maintain that, when questioned about returning defendant's property, Lester Allen advised defendant to get a knife or "check out." However, defendant testified that he did not request a transfer from Magnolia 3 dormitory because he did not want to be separated from Shriver. Rather, defendant *859 retrieved a homemade knife from the prison recreation yard, brought it inside the dormitory, and hid it with his belongings.
On Sunday night in Magnolia 3 dormitory, lights were turned off at 10:00 p.m.; and the dormitory television was turned off at midnight. All inmates were expected to be in bed by midnight. James Slaven, the correctional officer on duty when the stabbing incident occurred, made a head count at 12:30 a.m. Officer Slaven recalled that defendant, Shriver, and Warren Cain were all awake when that count was made. While Officer Slaven was in the shower room reporting his head count, four inmates were stabbed. When the lights were turned on, Officer Slaven observed defendant standing by his bed with a knife in his hand. Defendant's knife, in reality a sharpened file, was held in place by a glove or by gauze wrapped around his hand. No other weapons were found in the dormitory "shake down" following this incident. As defendant was escorted from the dormitory, he remarked to Captain John Purpera of the prison security staff, "I stabbed all four of them."
Accounts of the stabbing incident differ greatly. Inmates Warren Cain and Mark Duhon testified that they saw defendant get out of his bed and proceed to stab Ricky Gray and Mark Vincent as they lay in bed. Gray occupied a bed immediately adjacent to defendant's bed. Vincent's bed was located on the other side of Gray's bed. While Gray and Vincent were being stabbed, Shriver went to Lester Allen's bed and hit Allen with a sock containing batteries. With Gray and Vincent immobilized, defendant went to Shriver's assistance. Defendant stabbed Allen and in the process disturbed Darryl Washington, who occupied the bed immediately adjacent to Allen's bed. Washington was stabbed several times but managed to grab a radio which he hurled against a post.
Robert Shriver acknowledged that he had a sock filled with batteries and was also aware that defendant had brought a knife into the dormitory. He claims ignorance as to Ricky Gray's or Mark Vincent's role in the fight. Rather, Shriver contends that the fight began when Lester Allen approached his bed and said, "Come on and do something for me." In response to that proposition, Shriver got out of his bed, which was positioned end on end relative to defendant's bed, and struck Allen with the sock full of batteries. Defendant came to Shriver's assistance.
Defendant's version of the incident is supported in part by the testimony of fellow inmates, Al Bates, Aubrey Thompson and Donald Fontenot. Defendant maintains that when Shriver and Allen first started arguing he put on a glove and placed the homemade knife in his left hand. Defendant denied utilizing any tape or gauze to wrap his hand. When defendant got up to help Shriver, he was attacked by Ricky Gray and Mark Vincent. Gray had a knife in his right hand, and Vincent appeared unarmed. Defendant grabbed Gray's right hand; and defendant, Gray and Vincent fell onto a bed. Defendant described his encounter with Gray and Vincent: "[W]e was kinda rassling (sic), all three of us on the bed, standing up, falling back down, and I was just stabbing." After Gray and Vincent were incapacitated, defendant intervened in the fight between Shriver and Allen. Defendant stabbed Allen "once or twice". Defendant did not know if Allen had a weapon.
Defendant and Shriver were neither bruised nor cut as a result of the incident. Dr. Emile Laga performed autopsies on Ricky Gray and Mark Vincent. Dr. Laga noted that Gray had four stab wounds to the upper, left half of his body. One deep wound penetrated the front wall of his heart. No defensive injuries were found on Gray's extremities. Dr. Laga was certain that the assailant and Gray had been face to face when Gray was stabbed, and he hypothesized that Gray might have been in a supine position. Vincent suffered two stab wounds to his chest. Again, one wound penetrated the cardial sac, and Dr. Laga was certain that the assailant and Vincent had been face to face when Vincent was stabbed.
*860 Dr. Debra Cavalier, who performed the autopsy of Lester Allen, noted two stab wounds, one positioned in the mid-abdomen and the other on Allen's right side. Allen also had two cuts on his face and a laceration on his forehead. Again, no defensive wounds were located on Allen's hand or forearms, and Dr. Cavalier opined that Allen and his assailant had been face to face during the attack.

ASSIGNMENT OF ERROR NUMBER 1:
By this assignment, defendant contends that the trial court erred by failing to suppress a written statement made by him. Defendant argues that his written statement was tainted because prior to making that statement he had been taken into custody and orally questioned about the incident without having been advised of his Miranda rights. In addition, defendant contends that his written statement was involuntary because he was not advised by his interrogators, prior to making that statement, that any of the victims of the stabbing incident had died.
Testimony from the hearing on the motion to suppress reveals that a series of oral statements was made by defendant after he was escorted from the interior of Magnolia 3 dormitory. The first statement was to Captain John Purpera of the prison security force. As defendant was being led from the crime scene, he spontaneously remarked to Captain Purpera, who had just arrived on the scene, "I got all four of them." The trial court found that Captain Purpera had asked no questions, that defendant's statement was freely and voluntarily given, and, thereby, it was admissible at trial. Defendant does not contest that ruling on appeal.
Defendant was then handcuffed and placed in custody as the suspect of a homicide by Lieutenant Dallas Constance. From that point in time, defendant was in the immediate and personal control of an officer. Accordingly, his freedom was restricted beyond that of an ordinary inmate. Without advising defendant of his Miranda rights, Lt. Constance asked defendant why he had stabbed a fellow inmate. Defendant replied that he had stabbed four inmates. The trial court suppressed defendant's statement to Lt. Constance, finding that any questioning at that point should have been preceded by advising defendant of his constitutional rights. That particular ruling is not contested; however, defendant urges that the circumstances surrounding the giving of that statement, and an oral statement to Warden Ross Maggio, served to taint his later written statement.
According to his testimony at the hearing on the motion to suppress, Warden Maggio first spoke with defendant about 1:00 a.m. on the walkway outside Magnolia 3 dormitory. Warden Maggio stated that the primary focus of this conversation with defendant was to determine if any inmates, who remained in Magnolia 3 dormitory, were in danger because of the stabbing incident. Without advising defendant of his Miranda rights, Warden Maggio asked defendant what had happened. Defendant testified at the hearing that he answered Warden Maggio's questions because he wanted to explain the incident. Defendant did not feel compelled to answer. Defendant's response to this questioning was described as detailing the same basic sequence of events which defendant later set forth in his written statement. The trial court did not rule on the admissibility of defendant's oral statement to Warden Maggio because the state indicated that it would not seek to introduce it at trial.
At approximately 2:40 a.m., defendant was taken to Capt. Purpera's office. In the presence of Deputy Ivy Cutrer of the St. Francisville Sheriff's Office, Assistant Warden Prentice Butler, Deputy Warden C.M. Lensing, and Warden Ross Maggio, defendant was fully advised of his Miranda rights and executed a written waiver. Thereafter, defendant detailed the antagonism which existed among various inmates housed at Magnolia 3 dormitory and outlined the scenario which culminated in *861 the instant stabbing incident.[2] Handwritten notes of defendant's oral statement were taken by Deputy Warden Lensing and prepared in typed form. At approximately 3:30 a.m., defendant read and signed the typed statement, which was ruled admissible by the trial court and introduced into evidence by the state.
In written reasons for judgment on the motion to suppress, the trial court relied on Oregon v. Elstad, ___ U.S. ___, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), in rejecting defendant's contention that his written statement was tainted by the earlier unadvised questioning of Lt. Constance and Warden Maggio.
The United States Supreme Court recently decided in Oregon v. Elstad, supra, that a careful and thorough administration of Miranda warnings may cure the condition that rendered previous unwarned statements inadmissible.[3] The Miranda warning, itself, when properly administered, conveys the relevant information and thereafter a suspect's choice whether or not to exercise a privilege to remain silent should ordinarily be viewed as an act of free will. The United States Supreme Court reasoned that there is no basis for presuming coercive effect where the suspect's initial inculpatory statement, although technically in violation of Miranda, was voluntary.
In the instant case, defendant acknowledged during the hearing on the motion to suppress that he did not feel compelled to answer Warden Maggio's initial questions. Defendant also admitted that he was anxious to explain his side of the incident. We do not find that Warden Maggio's initial questioning of defendant was coercive or a deliberately conceived improper tactic to obtain defendant's initial statement. At that point in time, Warden Maggio's primary concern was to protec those inmates remaining in Magnolia 3 dormitory. The scene was one of confusion following a violent confrontation which left three inmates dead. Cf. New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
As Justice O'Connor explained in Oregon v. Elstad, supra:
It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
105 S.Ct. at 1293-1294.
Therefore, under Oregon v. Elstad, the relevant inquiry to be made in determining *862 whether a post-Miranda statement is admissible is whether it was voluntarily made. In addition, Louisiana statutory law requires that, before a confession or inculpatory statement may be introduced in evidence, the state must prove affirmatively and beyond a reasonable doubt that the statement was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; La.C.Cr.P. art. 703(G); State v. Nathan, 444 So.2d 231 (La.App. 1st Cir.1983), cert. denied, 445 So.2d 1232 (La.1984).
In this context, defendant argues that the action of the interrogating officers in withholding knowledge of the inmates' deaths constituted a form of inducement or coercion, rendering his written statement inadmissible as not being freely and voluntarily made.
Once a defendant alleges specific instances of police misconduct in reference to a statement, it is incumbent upon the state to specifically rebut each instance. State v. James, 459 So.2d 28 (La.App. 1st Cir.1984). The trial court's conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Collins, 470 So.2d 549 (La.App. 1st Cir.1985). The decision of the trial court on the question of whether the confession was voluntarily given is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. State v. Haynie, 395 So.2d 669 (La.1981).
At the hearing on the motion to suppress, defendant testified that he inquired about the health status of the inmates he had stabbed. Only Warden Maggio recalled discussing that topic with defendant. In response to defendant's inquiry, Warden Maggio advised defendant that he was not fully aware of the condition of those inmates. However, he noted that defendant was positioned in such a location that he would have been able to see medical personnel moving at least one inmate's body from the interior of the dormitory. In written reasons for judgment, the trial court noted: "... by the sheer brutality of the stabbing attacks, Burge was fully aware of the high probability that one or all of the victims would die as a result."
Assuming for the sake of argument, that defendant did not know the fatal effect of the wounds he had inflicted upon his fellow inmates, this fact alone would not compel a conclusion that defendant's statement was not freely and voluntarily made. Cf. State v. James, supra. The Louisiana Supreme Court has established that the central determination of voluntariness is whether the statement was the product of the defendant's free and rational choice. State v. Richey, 364 So.2d 566 (La.1978). Making that determination requires an examination of the totality of the circumstances. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
Defendant knew at the least that his victims were in extremely serious condition after having been stabbed by him a number of times. He was also aware of the illegal nature of his act. The record supports the conclusion that defendant fully understood his rights and the consequences of waiving them. Defendant's statement was the product of his free and rational choice, despite the fact that he may not have had knowledge of the fatal effects of his criminal actions. In light of all the circumstances, the record supports the trial court's conclusion that the defendant's statement was freely and voluntarily made and thus admissible.
Moreover, since defendant's testimony at trial is free of any constitutional taint and of equal cast with his prior inculpatory statement, we find admission of his statement, even if improper, was harmless error beyond a reasonable doubt. La.C. Cr.P. art. 921. See, State v. Robertson, 464 So.2d 760 (La.App. 1st Cir.1984), writ denied, 467 So.2d 534 (La.1985).
ASSIGNMENT OF ERROR NUMBER 2:
By means of this assignment, defendant contends that the trial court erred by failing *863 to suppress inflammatory, prejudicial photographs depicting the victims and the crime scene.
The admission of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. State v. Johnson, 475 So.2d 394 (La.App. 1st Cir.1985), writ denied, 478 So.2d 143 (La.1985). Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984).
The record indicates that the trial court closely examined each photograph submitted at the hearing on the motion to suppress, rejecting those which were repetitious or of little probative value. After examining the contested photographs, we find no error in the trial court's ruling that the probative value of those admitted photographs outweighs any prejudicial effect. Accordingly, these photographs were properly admitted over defense counsel's objection.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 3:
By this assignment, defendant contends that the trial court erred by failing to grant a mistrial after the state violated the witness sequestration order on two different occasions.
In the first instance, the record reveals that during the course of the trial, defense counsel noted of record that he had personally observed the prosecutor meeting with several prospective witnesses during a noontime recess. The witnesses in attendance were identified by the prosecutor as Dr. Emile Laga and Dr. Debra Cavalier. Dr. Laga performed the autopsies on Ricky Gray and Mark Vincent, and Dr. Cavalier performed the autopsy on Lester Allen. The prosecutor admitted that he had met with these two physicians and others; however, he maintained that each autopsy was discussed on an individual basis with the respective physician. Dr. Laga had just taken the witness stand when the objection was voiced and, outside the presence of the jury, confirmed the prosecutor's characterization of the meeting. Dr. Laga also testified that his prospective testimony was not influenced by that meeting. In denying the defense motion, the trial court relied on Dr. Laga's testimony and the fact that the witnesses at issue had been called to testify as medical experts.
In the second instance, defense counsel noted of record that defendant's father, Al Burge, had observed the prosecutor engaged in conversation with two state witnesses, Lt. Constance and Capt. Purpera, during a noontime recess prior to their testifying at trial. Under examination by the trial court, the prosecutor stated that he had not told either witness about testimony of prior witnesses but had asked each officer individually, in the presence of the other officer, about policy on transferring an inmate within the Louisiana State Penitentiary. At the time of defense counsel's objection, both officers had already testified during trial on the merits. The trial court noted that each officer's testimony had been of a limited nature and substantially the same as his respective testimony during the hearing on the motion to suppress defendant's confession. Finding no particular breach, the trial court denied defendant's motion.
Louisiana Code of Criminal Procedure article 764 provides for sequestration of witnesses upon the court's own motion or upon request of the state or of the defense. The purpose of sequestration is to assure that a witness will testify as to his own knowledge of events, to prevent the testimony of one from influencing the testimony of others, and to strengthen the role of cross-examination in developing facts. State v. Nolan, 457 So.2d 1246 (La. App. 1st Cir.1984), writ denied, 462 So.2d 190 (La.1984). It is within the sound discretion of the trial court to permit witnesses who have violated the order to testify.
*864 This may be done where the purpose of the sequestration order has not been thwarted or there is no evidence that the witness's testimony has been tainted. Id.
We find no prejudice to defendant arising from the trial court's application of the sequestration rule in this case. There is no evidence that any witness' testimony was tainted by the prosecutor's casual approach to the sequestration order. Dr. Laga and Dr. Cavalier testified as expert witnesses called to address different factual considerations. Although Lt. Constance and Capt. Purpera were questioned about internal transfer of inmates, the subject matter of the group meeting, this was not "a major issue in the case" as defendant contends in brief. Defendant, himself, freely admitted during his testimony at trial that he had not sought to be transferred from Magnolia 3 Dormitory because he did not want to be separated from Robert Shriver. Defendant was not concerned that procedural obstacles attendant to requesting that relief would have served to thwart his efforts.
For the foregoing reasons, this assignment of error is without merit.
ASSIGNMENTS OF ERROR NUMBERS 4 AND 5:
By means of these assignments, defendant contends that the trial court erred in failing to grant a mistrial due to harassment of the defendant and defense witnesses by the state.
The alleged harassment is based on the assertion that defendant and defense witnesses, Wayne Martin and Daniel Holmes, were moved by Louisiana State Penitentiary personnel to administrative lockdown, i.e., a cell block situation, several days prior to commencement of trial on the merits. Before these individuals testified at trial, defense counsel noted his objection of record citing possible prejudice "if these people come to court and don't want to testify because the power of the State has been brought upon them."
However, the record reveals that defense counsel's fears were not realized. Wayne Martin and Daniel Holmes each testified fully as to his knowledge of relevant circumstances surrounding the incident. On cross-examination, each admitted that his testimony at trial was not adversely affected by his transfer within the penitentiary. Defendant also took the stand on his own behalf. In detailing the relationship between Robert Shriver and Lester Allen, defendant noted they had, at one time, been housed together in the "dungeon". In defining the term "dungeon", defendant provided: "It is [sic] proper term would be administrative lockdown. It is where they put you when you [sic] waiting to go to court, or you have a rule infraction or you check out." Thus, contrary to defense counsel's voiced concerns, defendant apparently perceived placement in administrative lockdown as a routine administrative procedure which might be implemented prior to an inmate's courtroom appearance.
The record clearly reveals that the anticipated prejudicial impact did not materialize. In addition, it was not demonstrated that internal movement of these prisoners was grounded on any consideration other than appropriate operation of the penal system. Under these circumstances, these assignments of error are without merit.
ASSIGNMENT OF ERROR NUMBER 6:
By this assignment, defendant contends that the trial court erred by failing to grant a mistrial following improper comment by the prosecutor, who referred to defendant's nickname in violation of a court order.
The record reveals that defendant filed a motion in limine seeking inter alia to prevent the state from referring to defendant's prison nickname of "Iron Mike" in the presence of the jury. During the hearing on that motion, the prosecutor suggested that a definitive ruling be deferred. Thereafter, the trial court noted: "If his (defendant's) character is at issue, I'm not going to try to prevent that. If his character is not at issue, I'll instruct the State not to use that nickname."
During cross-examination of defendant, the prosecutor asked defendant his nickname after defendant acknowledged that *865 he was regarded as a strong inmate. Before defendant could respond, defense counsel objected; and the trial court sustained the objection. No further relief was sought.
If an objection is sustained, defendant cannot on appeal complain of the alleged error unless at trial he requested and was denied either an admonition to disregard or a mistrial. State v. Michel, 422 So.2d 1115 (La.1982). Moreover, assuming for the purpose of argument that the prosecutor's question was improper, the general rule regarding reversible error due to improper questioning requires a clear showing that the matters complained of are of such an extremely prejudicial nature that defendant was deprived of a fair and impartial trial. See, State v. Morris, 404 So.2d 1186 (La.1981).
In this instance, no such showing was made. The prosecutor's question did not reveal defendant's nickname. In addition, through defendant's opening statement, the jury learned that prisoners routinely referred to each other by nicknames. Thus, the fact that defendant was known by a nickname was entirely customary. In view of the foregoing, this assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 7:
By means of this assignment, defendant contends that the trial court erred by failing to grant his motion for post-verdict judgment of acquittal.
Defendant acknowledges that he stabbed his fellow inmates and that the stab wounds caused their deaths. It is defendant's contention that he was justified in killing Ricky Gray, Mark Vincent, and Lester Allen in self-defense or in defense of Robert Shriver.
A defendant in a homicide prosecution who asserts that he acted in self-defense does not have the burden of proof on that issue because the state bears the burden of establishing beyond a reasonable doubt that the homicide was not perpetrated in self-defense. State v. Brown, 414 So.2d 726 (La.1982). LSA-R.S. 14:20, in pertinent part, provides: "A homicide is justifiable: (1) when committed in self-defense by one who reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that killing is necessary to save himself from that danger...." It is also justifiable "to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person." LSA-R.S. 14:22. However, an aggressor or one who brings on difficulty, as a general rule, cannot claim the right of self-defense unless he withdraws from the conflict in good faith and indicates his intention of abandoning the difficulty. LSA-R.S. 14:21. The relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Brown, supra.
As often happens, eyewitnesses presented the jury with conflicting accounts of the incident. Defense witnesses suggest that defendant was initially attacked by Ricky Gray and Mark Vincent and while wrestling with both men, he stabbed each man several times. State witnesses, Warren Cain and Mark Duhon, testified that they saw defendant get out of his bed and proceed to stab Ricky Gray and Mark Vincent, who were lying in adjacent beds. This account was corroborated by forensic evidence detailing the situs of the wounds and by the lack of evidence suggesting a struggle.
The trier of fact is free to accept or reject in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31 (La.App. 1st Cir.1984). Apparently, the jury exercised its lawful prerogative and chose to believe the outline of events presented by the state. Moreover, Shriver's own account of his and defendant's confrontation with Lester Allen fails to *866 support justification for stabbing the unarmed Allen. Shriver testified that he answered Allen's proposition by striking Allen with a sock filled with batteries. By the time defendant intervened in that fist fight, Allen had already fallen back onto his bed and had stopped fighting, thereby negating justification for use of deadly force.
The law cannot permit even a harassed and threatened inmate of a penal institution to take the law into his own hands, arm himself, attack his enemy with a knife, and then, because of prior threats, claim justification for a homicide which follows. After consideration of all the state's evidence, we conclude that any reasonable trier of fact could have found that the state carried its burden in establishing beyond a reasonable doubt that the homicides of Ricky Gray, Mark Vincent, and Lester Allen were not committed in self-defense or in defense of Robert Shriver.
For the foregoing reasons, this assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 9:
By means of this assignment, defendant contends that the trial court erred by failing to grant a mistrial or to seat an alternate juror after one juror viewed defendant shackled.
The record reveals that, during the course of the instant trial, defense counsel noted of record that he had observed one of the jurors downstairs in the courthouse waiting for transportation home after trial had been adjourned for the day. As that juror waited, defendant was brought downstairs in handcuffs and shackles to be transported from the courthouse to Louisiana State Penitentiary at AngoLa.Defendant moved for a mistrial on the basis of this inadvertent sighting. In denying the defense motion, the trial court acknowledged that it too had observed the juror waiting for transportation. However, at that point in the trial, the jury was already fully aware of defendant's status as an inmate of the Louisiana State Penitentiary at AngoLa.The trial court weighed the need for security in transporting defendant and the juror's prior knowledge of defendant's inmate status in determining that the inadvertent sighting did not prejudice defendant.
We find that the trial court did not abuse its discretion in refusing to grant a mistrial. Under the circumstances, the possibility that on one occasion a juror may have seen the defendant shackled does not appear to have so prejudiced defendant as to warrant relief on appeal. Mistrial is a drastic remedy and should only be granted on a showing of substantial prejudice. State v. Murphy, 463 So.2d 812 (La.App. 2d Cir.1985), writ denied, 468 So.2d 570 (La. 1985). There is no showing that defendant's presumption of innocence was destroyed or that any juror was influenced by seeing defendant in handcuffs and shackles.
Accordingly, this assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 10:
By means of this assignment, defendant contends that the trial court erred by admitting into evidence the autopsy report of Lester Allen prepared by Dr. Cavalier.
The record reveals that following the examination of Dr. Cavalier the state sought to introduce into evidence the autopsy report of Lester Allen. Defendant grounded his contemporaneous objection to its admission on an allegation that the state had failed to provide him with a copy of that report in response to defendant's discovery request. Following a bench conference held off the record, the trial court overruled the objection finding that the state's failure to furnish the report was inadvertent and that defendant was neither surprised nor prejudiced by this omission.
The state's failure to comply with discovery procedures will not automatically demand a reversal. See La.C.Cr.P. art. 729.5; State v. Faulkner, 447 So.2d 1139 (La.App. 1st Cir.1984), writ denied, 449 So.2d 1345 (La.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 164, 83 L.Ed.2d 100 (1984). We agree with the trial court's reasoning *867 and find no undue surprise or prejudice. Before trial, defense counsel was aware of, and sought to take advantage of, the inadvertent error. Defense counsel was aware prior to trial testimony of Dr. Cavalier that she had performed the autopsy on Lester Allen. [See assignment of error number three.] In addition, existence of the autopsy report was revealed during direct examination of Dr. Cavalier. Rather than seeking a recess, defense counsel chose to vigorously participate in examination of that witness.
Under these circumstances, we find this assignment of error without merit.
ASSIGNMENT OF ERROR NUMBER 8:
By this assignment, defendant urges that the cumulative effect of the above referenced errors was so prejudicial as to preclude defendant's receiving a fair trial.
For reasons more fully set forth in our treatment of defendant's other arguments urged on appeal, we find this assignment of error meritless.
The conviction and sentence are therefore affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The attack on Darryl Washington does not form a part of this prosecution.
[2] In pertinent part, defendant stated that after Robert Shriver and Lester Allen started fighting he got up from his bed and retrieved a knife from his pillow. Defendant intervened in the fight between Shriver and Allen. Defendant stabbed Allen "a couple of times". Defendant was attacked by Ricky Gray and Mark Vincent and also stabbed each of those inmates "a couple of times".
[3] We note that by adoption of Article I, § 13 of the 1974 Louisiana Constitution, Louisiana incorporated the prophylactic rules of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See State In The Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). Decisions of the United States Supreme Court, although given careful consideration, do not necessarily control or dictate decisions by Louisiana courts construing the Louisiana Constitution, nor replace the independent judgment of the Louisiana courts so long as the state decisions do not infringe on federal constitutional rights. The decision of Oregon v. Elstad is well grounded in law and supported by strong policy considerations. It advances the legitimate interests of the criminal justice system without sacrificing the individual rights guaranteed by the constitution. Exercising the independent judgment of this Louisiana court, we adopt the Oregon v. Elstad holding (that a voluntary unwarned statement in a non-coercive environment does not "taint" a subsequent statement made after full warnings and waiver) as applicable to cases arising under Article I, § 13 of the Louisiana Constitution, for the sound reasons set forth in the majority opinion of the United States Supreme Court.